Okay, I think you were all here for the last one. So if the attorneys are going to argue, you want to step up, state their name, and spell their last name, and you know about the microphone, right? At least I heard it when I walked in. Michael Berger, B-E-R-G-E-R, Berger Shass, along with Jennifer Cantrell, although I'm going to be arguing. Great. Good afternoon, your honors. Michelle Jockner, J-O-C-H-N-E-R, of Shuler, DuCanto, and Forrest for Apali Gay-Schreiber, and I'm also here with my co-counsel Anita Ventrelli and Thomas Valenti. Great. Thank you. Do I have 20 minutes, your honor, reserved, sir? How about five minutes, please? Great, thanks. Thank you. May I proceed, your honor? Please do. Well, first of all, good afternoon. As I said, Michael Berger, Jennifer Cantrell, of Berger Shass, on behalf of Rock Schreiber, who is present this afternoon. By way of a brief factual background, the parties were divorced in September of 2011. A judgment was entered at that time incorporating the parties' marital settlement agreement. At the time, Mr. Schreiber was a partner at the law firm of Skadden Arps, and his former wife now was a non-pregnancy attorney, and she was the co-founder and 50% owner of a company called McCormick Schreiber, which is a premier attorney search firm. At the time of the divorce, Mrs. Schreiber, or Gay, represented that she had no income, and that for the year 2011, the year of their divorce, she would not be receiving any further – any distributions from her business. The marital settlement agreement provided for Mrs. Schreiber to receive four years of maintenance at $21,000 per month, and it was to terminate upon all the normal courses of termination, but as well as at the end of a four-year period, if she did not file a motion to extend. The judgment also provided that Mrs. Schreiber received a $4.1 million in assets, including a debt-free luxury former marital residence in Lincoln Park. Mrs. Schreiber – the former Mrs. Schreiber, Gay, filed a few days before the fourth-year anniversary of the judgment, and thereafter was awarded temporary maintenance during the process of the petition for review going on, at the same amount that she received pursuant to the MSA or the marital settlement agreement. At the trial and review, Gay's income was established to have grown from zero at the time of the judgment up to $250,000 for that particular year, as well as the fact that in that year, as well as three prior years, so four in total, she averaged $230,000 a year in income. The evidence also showed that her lifestyle improved between the divorce and the hearing on the petition for a rule. Notwithstanding, and if I may, her assets went up from $4.1 million as of the judgment to approximately $5 million. Notwithstanding the evidence of the substantial change that occurred after the divorce, the trial court abused its discretion by awarding Gay, or former Mrs. Schreiber, an increase in her maintenance to $23,320 per month, made it indefinite, as well as retroactive to filing for the review. As a result of the trial court's error, Gay has to date received eight years of maintenance the last four years at a higher amount than originally agreed to in the marital settlement agreement. The record reflects that the trial judge here made numerous errors, including the law of res judicata. This court, in Inmate and Marriage of S.D., noted that a maintenance award contained in a party's marital settlement agreement took into account the party's standard of living as at the time of the divorce, and that during marriage, as well as that the maintenance award is res judicata as to the facts at the time the award was entered. The trial judge ignored that whole concept, which in my opinion is black letter law, and allowed Gay to remitigate in their own lifestyle, go behind the marital settlement agreement and the judgment by incorporating and permitting evidence of the party's lifestyle and finances predating the marital settlement agreement. Now, you wouldn't be okay with $21,000, would you? I'm sorry? You wouldn't be okay with $21,000 a month, would you? Depends on the facts, Judge. No, I meant in this case. No, we would not, because you go from zero to $250,000 a year, and you can even make more. How do you get an increase, let alone stay at $21,000? I mean, it makes no sense to me. Well, did the circuit court have authority to revisit the maintenance? Yes. Okay. Yes. And so what would a judge look to under these facts, given the previous agreement? What do you look to to decide what to do? You look at what has occurred since the judgment of dissolution of marriage. You don't go backwards. You don't go to predate it. You go, what has changed from the date of the judgment to the date of the review? That's what you look at. And if you look at that review, you can see that the former Mrs. Schreiber does not need, forgetting the cohabitation issue that's before the court, does not need any further support. But going behind, would a court be justified to say that looking forward from the date of dissolution forward, this is the position the party is in today, and it's because of what has taken place in the past, so let's keep it all the same or increase it a little bit? Well, I think things haven't looked the same after the divorce. And that's what the court's supposed to focus on, not what happened before the divorce. No, I understand that. But since the settlement decree to today, she's maintained what I wanted her to maintain from day one. So why not continue that? Couldn't a judge say that? Well, because she received what she received because she had no earned income. She had no income at the time of the divorce. She attested to an affidavit on the road. I had no income, and I'm not going to get any distributions in 2011. If she had $250,000 of income at the time of the divorce, Your Honor, my guess is she wouldn't have received any maintenance at all because the wealth status established at that time plus the $4.1 million of assets that went up to $5 million upon was up to $5 million as of the review. Circumstances at the time of the divorce versus the time of the review are totally different. And the record reflects it, Judge. And this error of law caused by the trial judge, as a matter of law, is subject to a de novo review by this Court. But under 504, isn't the standard of living established during the marriage one of the things that the factors of the child court should look at? Yes, Justice. However, that's done by the marital settlement agreement. The law is clear that the standard of living is established by the marital settlement agreement and the judgment. That's what establishes it. And that established at that point with no income, she needed $21,000 a month in taxable four-year maintenance. So that establishes, and the case that was decided by this district in the marriage of SD specifically says that, that that is the marital lifestyle as of the date of the judgment. You don't go beyond it. You don't go into the marital lifestyle. That number reflects it by itself, Judge. And clearly, over our objections, we filed a motion to eliminate. We thought we'd made numerous oral objections during the trial. And in our motion for reconsideration, as well as the reply, we brought up the fact that this Court The original motion to eliminate was made before a different judgment, correct? No, it was made before this judgment. It was made before the trial judgment. And in fact, there's case law that says, and again, denied by the trial judge, the motion to eliminate all the oral motions and the motion to reconsider. And there's case law that provides that an error such as this contaminates the trial court's entire analysis and mandates reversal. The Court also abused its discretion in awarding gay retroactive increased maintenance and making the award indefinite. The record's clear. As I said before, her finances have improved dramatically. She goes from no income to $250,000 of income. She goes from an average over the last four years of $230,000 of income. And her assets go from $4.1 million to approximately $5 million. I mean, to recap, since the divorce, Gay's income goes from $0 to $250,000. Her net worth goes up approximately $900,000. And the Court awards her retroactive increase in maintenance and makes it indefinite? That doesn't make any sense. I mean, that just doesn't make any common sense. How do you go to $0 to $250,000? But that's the way it's always done at the trial court. It's always retroactive until the date of filing. Yeah, there's nothing wrong with entering a retroactive order. I'm not suggesting that. What I'm suggesting is that that's part of her order in increasing the dollar amount, making it retroactive to the filing, as well as making it indefinite. Whatever her order would have been, would have been retroactive regardless. Yes. Yes. Oh, for sure. Didn't the trial court take into account, though, the amount she was making? We don't believe she did. We believe that she went into a premarital lifestyle, which to me was never supported by the record that was even before the court, and she didn't need it. There was just no need. Her expenses had gone down since the divorce. In addition to the increases in her income and her assets, her expenses decreased substantially. Her longtime partner, her nine-year partner, Tony Brown, was paying for a lot of her expenses. And her children were now emancipated after that four-year review, and there were numerous other expenses that she had during the marriage that she no longer had at the time of the review. There's also evidence, Your Honors, that she had the ability to earn additional income from her own business but allowed them not to do it. She's working four days a week when she's in Chicago, in town. She travels a month to two months a year, mostly with her partner, Tony Brown, and pays several of her employees substantially more than she makes herself. And she could earn more if she wanted to do it. I mean, to me the law is very clear. First, the ultimate aim of someone receiving maintenance is to allow that dependent spouse to become self-supporting and independent. The second is that the spouse seeking maintenance is required to maximize their income. The trial court ignored this law. In fact, what's interesting is the trial court, and I don't know why, but she found that Gideon has always been able to support herself. She is and has been self-sufficient. And that by itself should have terminated the analysis and she should have terminated the maintenance right there and then because that was her finding. But instead, she gives her more maintenance and makes it indefinite, forgetting the retroactivity for a moment, Judge, but it just doesn't make sense. Excuse me. Is it your position that the trial court was not aware that at the time of the initial award, she was making no money? She was because of her allowance of evidence that predated the judgment and the marital settlement agreement. She was. She was aware that the initial $23,000 or $21,000 award was in light of the fact that she had no income. And she was aware, the trial court was aware, that currently she's making $230,000 approximately and I'm still going to give her $23,000. That's exactly what happened. It made no sense to me. It just turned common sense upside down. There was no common sense to this. There's no support for it. There's no basis for it. The court also erred factually regarding the tax calculation. In what way? She assumed when she made her award that Gary had a combined fed and state tax rate of 44%. There's nothing in the evidence to support that. In fact, she came out on the record and said, I may have made a mistake. Well, the evidence that is in the record, including the former Mrs. Shriver's tax returns for four years, as well as her own expert, who is allowed to testify as to marital lifestyle, et cetera, said she had a tax rate of approximately 31%. So how do you get to 44% when it's 31%? It's all in her own expert's report, as well as if you do the simple math on all of her tax returns, you can see it. And she said, I may have made a mistake. Well, she did make a mistake. Her ruling in finding that Gary was not cohabiting with her partner, Tony Brown, of approximately nine years was clearly, and that was as of the time of the review, clearly was against the manifest weight of the evidence. Based on our research, this district has not issued a decision addressing cohabitation as a basis for terminating maintenance in more than a decade. There's six factors that are taken into account, right? Yes, there are. And which ones didn't the court take into account? Well, what I was going to discuss, and not to avoid your question, I believe the court looked at all six and got them all wrong. And according to the Miller case and the Walther case out of the second and third districts, you don't really have to establish all six of the factors. You have to look at each case because each case is unique, and you have to look at the circumstances that surround the particular case. Look at the six factors here and the length of the relationship. They've had an exclusive relationship since 2008. The amount of time they spend together. They travel a month plus a year together. Mrs. Schreiber stays in his house frequently in Telluride. Her children, their children stay in his house over the years in Telluride. He stays in her house in Chicago. He buys a house. See, something that these cases from the second and third district recognizes, these are two very wealthy people. Mrs. Schreiber, the former Mrs. Schreiber and her partner are multimillionaires. It's not the average person who needs. They don't need to share their money. They don't need to share expenses. They're multimillionaires. And what the Miller court says is that there's an explanation. And an explanation is you don't have to have a financial partnership. You don't have to co-miner your assets. And they specifically set forth if people have an abundance of wealth for estate planning, that's exactly what we have here. We have an abundance of wealth. They can do this as long as they want to do this. They don't have to share the same house. They do have houses a couple of blocks away in Chicago. And Mr. Brown testified that he's with Mrs. Schreiber, the former Mrs. Schreiber, three or four months a week when they're both in Chicago. And he sleeps at her house approximately three nights a week. There's no question. They speak to each other daily one to two times even if they're in town. This is an ongoing de facto marriage, and it has been. The third factor is the nature of their activities. Extensive travel, dining together, monogamous sexual relationship for nine years, celebrating holidays, always their birthdays pretty much. They attend important family events together. They socialize as a couple. They travel with other couples as couples. They've jointly hosted dinners at both his house and Tony Brown's house. The Schreiber children vacation with them, especially at Tony's house, multiple times. The fourth is whether they vacation together. Well, the records were full while they're traveling, including Mr. Brown taking her for her birthday to Turks and Caicos as well as going to France, taking her to France. They travel extensively. Whether they spend holidays together is number five, and they spend a number of holidays together, and they typically, as I said before, spend their birthdays together. The sixth factor, which is really important in this particular situation, is the interrelation of personal affairs including finances. And as I said, both are independent and wealthy. Both have testified that they're multimillionaires. They take turns paying for general expenses. Mr. Brown usually pays for plane tickets and pays for hotels when they dine out, but they both pay for certain expenses as it relates to both of them, including Mrs. Schreiber. This is a deeply interrelated in their personal lives, and I think in the case law that is current and out there, talks to the issue of permanence and a mutual commitment. Both Gay and Tony Brown testify that they love each other and that they have no intention of ending their relationship. This relationship is nine years. I'm sure your honors have dealt with appeals that were involving marriages that were a lot less than nine years. A monogamous nine-year relationship where everything is the same as married couples other than they don't call in their dollars because they don't have to because they're incredibly rich. So as the Miller and Walther's case say, you have to look at every case on its own facts. Every case is unique. This case is absolutely, there's absolutely intended permanence. There's absolutely a financial and mutual, excuse me, a mutual commitment to continue that relationship. And both parties have individual abundance of resources,  that unless otherwise explained, they should have some kind of financial involvement. But the unless otherwise explained, an example of it by the Miller Court is, includes each partner having individual abundance of resources or estate planning. These are, as again, they have their own abundance of resources. There is, it is recognized in Miller that there can be a de facto marriage without a financial partnership. It also stands for the fact that you do not have to live in the same residence to be found to be cohabiting or having a de facto marriage. The Miller Court also goes on to say that the trial court could consider the party's awareness of the legal consequences of cohabitation. Here, both Gay and Tony are both lawyers. They're both attorneys. They're both aware that Gay would lose her maintenance if she was found to be cohabiting. Regardless of whether or not Gay and Tony are attempting to circumvent the law or gain the system, as they say on the street, their relationship is more mutually committed and longer lasting than many marriages. Clearly, the evidence proves that this is a de facto marriage with permanence and mutual commitment, and is an example of the modern reality of adult relationships, especially among the wealthy, that rises to the level of a de facto marriage. The evidence is clear. We believe that the trial court has erred, as I said before, on numerous issues. Some as a matter of law. Some as a matter of fact. But we believe that this court should reverse the trial court's decision in its entirety due to the trial court's error of the moral regarding race judicata and the effect on the Moral Settlement Agreement, as well as the other myriad of errors. Moreover, due to the de facto marriage relationship between Gay and Tony Brown and or due to Gay's uncontroverted ability to fully support herself, the court should enter a judgment ordering that Rod's maintenance obligation to Gay is terminated, retroactive to the end of the four-year review period. Thank you. Good afternoon again, Your Honors. I just wanted to state for the record that also Gay Schreiber is here with us today in the courtroom. Counsel asked you to consider common sense. Well, what he's actually asking you to do is to check common sense at the door if you accept his arguments. You've just heard about 20 minutes from counsel of argument in which Rod Schreiber, who makes about $5 million a year and has assets of about $14 million, has been cast as the victim of both Gay and also Judge Deborah Walker, who heard 19 days of testimony in this maintenance review case. This is a maintenance review. It's not a modification. She found Gay to be the more credible witness between her and Rod. Gay was found to be more credible, and you are to give that determination deference. And Judge Walker also prepared a very detailed 12-page single-spaced opinion setting forth her thoughtful analysis of the required statutory factors in both sections 504 and 510 of the IMDNA, an opinion, Your Honors, that is scarcely cited in Rod's brief. And that's the opinion that we're talking about today, and he spends hardly one drop of ink on that opinion in his brief. Indeed, Rod's brief that he submitted to Your Honors in his reply is simply a re-argument of his position before Judge Walker. It actually reads like a closing argument in a trial case rather than as an appellate brief in the apparent hope that he will retry this case in his favor, something that would be improper to do. And he ignores and twists the facts as found by the trial court while citing the inapplicable case law, which he then basically abandons in his reply brief wherein he takes 14 of the 19 pages that he states in reply to tell Your Honors how he didn't forfeit all of the various claims that are in his brief. Think about that, 14 of 19 pages of his reply about how he did not forfeit his claims. He basically abandons his arguments with respect to the case law to convince this court that he has been persecuted because after a 24-year marriage with children, Judge Walker made gays' maintenance permanent, which she had the absolute authority to do under the statute, and she increased it by about $2,000 a month, which is about $24,000 a year. Put that in context. I think that's very important. So that gay could maintain the marital lifestyle. That's another very important component here, is that she could maintain the marital lifestyle of the parties. And in sum, this cost Rad only between 5% to 6% of his total compensation on a yearly basis. Again, put that in context. What about the contention that when she received the initial award, she was not working, and now that the award was recalculated or extended, she is making $250,000 plus or minus a year? Your Honor, there was never a finding that was made as to either party's income with respect to the MSA at that time. There was no finding made by any court. At what time? At the time that the MSA was entered and the Judgment for Dissolution of Marriage incorporated the MSA. As we state and we set forth in detail in our brief, there was never a finding made as to gay's income. There never was a finding made as to Rad's income. There never was a finding made as to the lifestyle of the parties. And indeed, the proof-of-transcript, and we do talk about that proof-of-transcript in our brief, the proof-of-transcript shows that there was no agreement between the parties as to marital lifestyle. In fact, Rad's counsel at the proof-of, and we note this at our brief, and also it's at record page 25 to 28 of the transcript, the MSA reflects the court's pretrial recommendations in totality, with maintenance being only one issue as part of an overall agreement, with Rad himself making it clear that he did not agree, it's in the transcript, he did not agree that gay needed the $21,000 at that time. In fact, he stated that he thought she needed no maintenance at that point. But despite that, there was no agreement, there was no finding, and that's why the arguments with respect to res judicata do not hold any water, because in order for there to be res judicata, you must have had an original finding. Made by the trial court. And as we point out in our brief, your honors, I would direct you to our brief and to the discussion that we set forth in our brief. Is the marital settlement agreement incorporated into the judgment? It's incorporated into the judgment, but there's no findings. So once the marital settlement agreement is incorporated into the judgment, the marital settlement agreement, whatever is there, becomes the findings of the trial court. Once the judge signs off on the final judgment. We disagree that there were findings that were made. That there were actual findings with respect to no findings as to income. There's a settlement agreement between the parties, and there are certain facts laid out in the marital settlement agreement, and once that agreement is, once the judgment is signed, it actually becomes a part, the marital settlement agreement becomes a part of the trial court's judgment. Yes, it does. And those become the findings of the trial court. Well, your honor, I think that Judge Walker explained this the best when she rejected the exact same arguments that are being raised by Rod here, because he raised them as part of his motion to reconsider. And he raised them as a challenge to her granting of a, to her denial of a motion in limine. And, I'm sorry, to her granting of the motion in limine. And there, Judge Walker pointed out that there was no finding of marital lifestyle that had ever been made by the court, that the proof up showed that the parties disagreed as to marital lifestyle, and she said with respect to this exact same argument, which she disposed of as part of her motion to reconsider, she says, and I quote her, and I think this answers your question, because res judicata literally means a thing that has been decided. How could the thing have been decided if there never was a decision? If there never was a judgment? If there never was an agreement by the parties as a decision to what their lifestyle cost? And, yes, your honor, that's right. The MSA was incorporated within, within the judgment for dissolution of marriage, but there never was a specific statement within the MSA as to the lifestyle of the parties or as to the agreement, I'm sorry, as to the income of either of those parties. So, so the court, when they entered the MSA four years ago, four years prior to this, said that based upon what, an agreement of the parties or, or what, that she's going to get $23,000 a month. Yes, there was an overall agreement. The way that it was described by Rod's counsel at that time, it was an overall agreement. And that was $23,000 without any consideration of whether she was making a dime or a dollar at that time. There was no finding as to her income. There was no finding. It was an agreement the trial had started. And we was on the bench. I understand your position. Now, fast forward, where she wants a recalculation or an extension, right? Yes. Why, why wouldn't the judge want to know the change in lifestyle? And in hearing the change in lifestyle, if somebody says, well, she's making $230,000 a year today, wouldn't a logical question be, well, what was she making back then, to see whether there was a change in it? I understand your question, Your Honor. And I think that that comes from the misstatement that comes out of counsel's brief, labeling this as a modification proceeding where there should be a substantial, where Gabe would have to show a substantial change in circumstances. This is not a modification proceeding. Judge Walker repeatedly corrected counsel at the trial level to say this is not a modification and this is not a rehabilitative maintenance award. This was a review proceeding where a substantial change in circumstances does not have to be shown. That's not the standard. And if you look at the case of in-ring marriage of Golden, which is cited by Rod in his brief, that's his own case, it makes it very clear that the standards are different between a modification proceeding and a review proceeding. In a review proceeding, the court is required to look at all of the factors that are in Section 504 of the INDMA and also in Section 510. One of them is the lifestyle that the parties have during the marriage. And by the very definition of marital lifestyle, marital lifestyle is what happened during the marriage. You have to look at marital lifestyle. If that's the case, then it would seem to me that the lifestyle at the time, the lifestyle during their marriage was such that she was not working and she needed $23,000 a month to maintain that lifestyle. Right? Or $21,000, whatever it was. Right? That was what the parties agreed to to settle the case. Right. But the change in lifestyle, to show the change, isn't it substantial change that now I'm working and I'm making $230,000 a year? Well, Your Honor, I think that there's another misconception here that Gay was not working. She was working at that time. Counsel yourself told Your Honors that she was working. She had a company at that point. It's the same company that she has now. That's what counsel said. There's nothing of record. There's nothing of record at that point as to what she received. There's no finding of either party's income at that time. But she was working. He mistakes that. She wasn't just sitting at home doing nothing. She had her business. Her business was functioning. There was a pretrial recommendation that came out of pretrial proceedings before Judge Reuben Murphy, who was not the person who actually got the case for trial, and that was Judge Walker. Judge Reuben Murphy had pretrial proceedings, and she thought that perhaps that based upon what was before her at that time, she recommended that Gay or she thought that Gay perhaps could earn between $100,000 to $150,000 a year from her business. And it was based upon that that she gave pretrial recommendations. The parties could not settle prior to trial. They actually went to trial. Gay was on the witness stand, and then they ended up settling the case before it went any further. So there were, again, there were no findings. There was no evidence that was actually presented to the court. But Gay was working. She didn't go from zero to nothing. And, again, to say that there were findings or that that's res judicata, there were no findings. So Judge Walker explained. Justice Pierce's question, though, so has there been any evidence as to what she was earning during the period prior to the dissolution? Has there been any evidence of that before Judge Walker? Counsel who tried the case has reminded me that there were the 2009 income tax returns that were in evidence at that time, and they were in evidence at the time that the trial was going to move forward. But she didn't disclose any income at that time. And the tax returns were, the 2009 tax returns were the ones that were, that they were in evidence. And they didn't show any income? They did show income. What was that amount? But that's, I think that's the point of the question that Justice Pierce is asking right now. What was that income versus what the income was when it came up on review? Because it seems like it's difficult to ignore all of that, even though you're not talking about a modification. We understand the difference. We don't need you to explain it. But if it even ended a review, that becomes an issue because, again, the goal is to look to, as 504 requires, the lifestyle during the marriage and maintaining that lifestyle. So do we have an answer? I do, Your Honor. The fact is at the time of the trial, what Gay could earn was a heavily disputed issue. In the 2009 underlying divorce trial. She owned the same business then, but she owns now. Same percentage she owned then versus now. The business was a little younger. But in connection with the recommendations, as Ms. Jackner said, Judge Rubin-Murphy was making the assumption in making her pretrial recommendations that Mrs. Schreiber would earn more afterward. That's why, if you looked at the maintenance she was awarded at the time, if we roll back the clock to 09, the maintenance she was given then wasn't enough to pay for the lifestyle that she was enjoying at that time. Judge Rubin-Murphy made a recommendation figuring she would earn more into the future. She did, indeed, earn more in the future. But that was expected at the time of the dissolution, which is why, even if we were in a change circumstances situation, it wouldn't be a change or not enough of a change to make it so that she didn't still require maintenance from Mr. Schreiber to live her marital lifestyle, not just to meet needs. And when it comes to the marital settlement agreement, the only thing in it is what he would agree to pay and what she would receive. The prove-it transcript documents the disagreement that we had over lifestyle. And if the court, as Your Honor's question suggests, considers lifestyle to be what you earn to be able to use to pay for what your living expenses are, as well as what the living expenses are, she didn't have nothing, and all of that was taken into consideration at the time of the original decree, but there were no findings. Judge Rubin-Murphy never got to a trial where she made findings, and Your Honors can comment on marital settlement agreements from page one until the end. You will not find any recitation of lifestyle. You will not find any recitation of either party's income. And in the detail of the trial that Judge Walker conducted, there were arguments there were experts. Indeed, Mr. Schreiber introduced an expert to try to say that Mr. Schreiber should be earning even more now. That expert who essentially created an income number failure was found to be disingenuous. An evaluation for business was found to lack credibility and to be disingenuous. I hope I've answered the court's question. Thank you. Can you identify yourself for the record, please? My apologies, Your Honor. Thank you. Anita M. Ventrelli, V-E-N-T-R-E-L-L-I. Thank you. Thank you. And, Your Honor, I would just like to take the remaining time that we have to just answer some of the points that were made by counsel in his opening statement. Counsel talks about various findings or non-findings. He states that Tony Brown paid for various items of gay's expenses. He has no citation to that in his brief. That's just a claim that he has without any support. Therefore, it's a forfeited claim. He says that she works four days a week. The finding by Judge Walker was that gay has always spent four days in the office and she works one full day at home or remotely. And Judge Walker found, and we have the citation in our brief, Judge Walker found that gay works full time right now. So those are misstatements. Those are things that were never found by the trial court, and those are also things that were never cited to the record by opposing counsel. It is not just, again, it's not just about self-support here. There's no question that gay can support herself, that she's self-supporting. The question is whether gay can be maintained in the lifestyle to which she had been accustomed during the marriage. And that's what Judge Walker correctly did. She exercised her discretion correctly in awarding gay increased maintenance of only $2,000 per month and a permanent maintenance award in duration, which would absolutely be required if the guidelines were to be applied. They had too much income. The guidelines were not applicable, but it would be a permanent maintenance for 24 years. Would you address the tax issue, please? I'm sorry? Would you address the tax issue, please? Oh, absolutely, Your Honor. Okay, first and foremost, the tax claim is, as we state in our brief, the tax claim is forfeited. There's not one citation to the record in support of this argument, in the argument at all. And on top of that, counsel states that the trial court admitted that there was error. That's not true. If you look at our brief and if you look at the record, the trial court said that, I believe that I calculated the taxes properly. And she stated, quote, I'm not saying that I agree with Rod that I erred. And those citations are in our brief. When this was brought up, this tax argument was brought up in an untimely manner. It was not timely raised and presented. It was brought up early during counsel's argument on a motion to reconsider where the tax rate in this tax argument was not presented in the written motion. It was brought up early. Ms. Ventrelli, who is the trial counsel, objected immediately. And there was a back and forth between counsel and the court as to whether this was presented correctly or not. But then the court said, well, I believe I calculated the taxes properly. Again, a quotation, I'm not saying that I agree with Rod that I erred. But she granted reconsideration on this specific point over Gay's objection to allow both sides to submit something very short on the tax issue. Rod filed a memorandum on the maintenance-related tax calculation, and Gay instead filed a motion to reconsider, stating that he untimely raised this alleged tax calculation error. And the key date here is on December 6, 2017. December 6, 2017, the court heard Gay's motion to reconsider. The court rejected, during that argument, the court rejected Rod's claim that it had made a clerical mistake. The court stated that it should, quote, care to examine the tax tables and other issues. And that's at R-3782. So that's in the record. She said, I looked at the tax tables, I looked at other issues. And she granted Gay's motion to reconsider, agreeing with Gay that Rod had untimely raised the alleged tax error. Now, because of that, Rod must challenge the December 6, 2017 order, wherein the court determined it had no jurisdiction to entertain his untimely claim that a tax error was committed. And although Rod generally states at page 1 of his brief that he is appealing the December 6, 2017 ruling, he devotes one scant sentence to that ruling in his statement of facts, and does not mention it again. Ever. Rod offers no argument to this court at all as to why the court's December 6, 2017 ruling granting Gay's motion to reconsider is incorrect. Now, he jumps immediately to the merits of the issue, and never tells this court why Judge Walker was incorrect in finding that she had no jurisdiction. And it's improper to argue the merits of this issue for the first time on appeal, because the merits were never argued. It became a jurisdictional issue. Now, in his reply, Rod says he didn't need to bring up the issue in his motion to reconsider to preserve it, but he did bring it up. He has a ruling on that motion to reconsider, and that's a December 6, 2017 ruling, and that's what he needs to appeal. But he doesn't offer any argument on it. But then he goes to the merits. And with respect to the merits, the court confirmed at page 2 of her ruling that she considered all of the pertinent statutory factors in Section 510 and 504. The court did not purport to state any type of tax calculation for Gay, so Rod builds really a straw man to tear him down, suggesting that the court committed a factual mistake regarding its calculation of the maintenance award to Gay. The court provided no specific calculation, and there is nothing in the statute that requires the court to provide such a calculation. Compare this to Section 505 of the IMDNA, where the child support statute, it refers to a very precise calculation. So nowhere, again, nowhere does the court mention any type of effective tax rate. That is Rod's assumption. It's just an assumption he assumes without any reference to the record. The court referenced lifestyle as approximated. She was trained to approximate different things. And she also said, in her opinion, rounding should inure to Gay's benefit because of inflation. This does not cure that. It doesn't cure Rod's failure to timely challenge this. He needs to talk about why the court erred in the December 6, 2017 ruling. But apart from that, he's forfeited his claim. But apart from that, his claim lacks merit. Finally, Your Honors, I would like to briefly talk about the cohabitation claim. Before Your Honors, counsel talks about the Miller case. He briefly, very briefly, hardly makes any argument or comment about the Miller case in his brief. Rather, he talks about a brief, a case in his brief. He talks about intermarriage of Walther, which is a third district case that was decided after the court delivered its judgment here. In our brief, we note the case from this court that's Bramson v. Bramson. And I think that that really encapsulates why there is no cohabitation claim here. Cohabitation occurs when it has materially affected the recipient's spouse's need for support because she either receives support from her co-resident, or she used the maintenance that she gets in support for monies to support him. He can't be persuasive because it was decided after the worker made her decision. No, no, no, no, Your Honor. We're just saying it's something that came from the third district. There's just one appellate court, and they'll run. Yes, of course, of course, of course. But we're saying Bramson encapsulates the reasoning. You look at the totality of the circumstances. That's what Judge Walker did here. She applied Miller. Again, Miller is highly talked about by counsel. He talks about the Walther case and talks about how Walther is factually distinguishable, and it's so factually distinguishable that it mandates reversal here. But the thing is, it does not. It does not mandate reversal here. Miller was applied appropriately in Walther. The former wife slept at her boyfriend's house every night for nearly a year. We're way over time, so I'm going to have to ask you to wrap this up. Of course. In sum, Your Honor, Walther is not applicable. It doesn't help. It's a policy argument that's best left to the legislature. It's not for this Court to decide. Thank you. Thank you very much, Your Honor. I know you three can read and read very well. I wasn't going to recite everything in our brief. The fact of the matter is the tax issue could have been brought up at any time, and the evidence is already part of that record as a result of her tax returns and her expert's report. To cite the Bramson case, a 30-year-old case, when it was one year into the new Marriage and Disillusionment Marriage Act? I mean, really? There's no sense of reality today, nor the idea that we didn't cite to the record because there's multiple states on multiple pages as to what Mr. Brown is paying for for Mrs. Schreiber. What's important is another thing. Because of the year in the Court allowing this case and the evidence to predate the divorce, Mrs. Schreiber, former Mrs. Schreiber's financial affidavit dated June 2011 They got divorced. The technical divorce was September 11. She filed an affidavit on her own. I have no income. And in her footnote, she says, I don't, and that's part of the record here, and I don't expect any distributions for my business in 2011. Was she working? She was working, but she wasn't making any money. Mr. Schreiber felt, and the colloquy on the proof of which is basically irrelevant, was that she could make money. That was the whole thing. And the four years was sufficient time for her to do it, and she's done it. Your Honor, there is absolutely very little accuracy to what opposing counsel has said. And the issue of credibility, there was an issue, one issue, that related purchases prior to the divorce related to clothing at media markets where there was contradictory testimony. That's the only thing that was ever brought up. An issue that should have never even been before the court, going back nine, ten years at that time, saying, who incurred these expenses? And Mr. Schreiber said, that's why I used to buy my suits. That's why I used to get my clothes. What the judge determined on that one issue, it shouldn't even have been before the court. It shouldn't even go in there. The amount of money that she was awarded, and for the period of time that she received it, says it all according to the law. That's her lifestyle. That was enough to get her into her moral lifestyle. Now she makes more money than that. And her assets have gone way up. How do you not take that into consideration by reducing and or terminating? But the law on cohabitation, the fact that marriage has changed in the last 40 years, dramatically. You have a de facto marriage here, totally unequivocally. And this case should be reversed, remanded with the termination of Mr. Schreiber's obligation to continue paying any further support to his former wife. Thank you very much. Great. Thanks very much. I appreciate all the hard work and the good briefs and the arguments. Thank you. We'll take it under consideration. Thanks.